<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

MELISSA BOYLE,

                  Plaintiff,

v.

NANCY A. BERRYHILL,

                  Defendant.

Case No.:  2:17-cv-02525 (PAZ)

**OPINION**

---

**APPEARANCES:**

JAMES LANGTON
LANGTON & ALTER, ESQS.
1600 ST. GEORGES AVENUE
P.O. BOX 1798
RAHWAY, NJ  07065
      On behalf of Plaintiff

KATIE M. GAUGHAN
SPECIAL ASSISTANT U.S. ATTORNEY
c/o SOCIAL SECURITY ADMINISTRATION
OFFICE OF GENERAL COUNSEL
P.O. BOX 41777
PHILADELPHIA, PA  19101
      On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Melissa Boyle for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401, et seq.).

Plaintiff appeals from the final decision of the Administrative Law Judge ("ALJ") denying the

application; Defendant, the Commissioner of Social Security ("the Commissioner"), opposes

Plaintiff's appeal.[1]  After careful consideration of the record, including the ALJ hearing transcripts, the ALJ's decision, and the pleadings and memoranda of the parties, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f).  For the reasons set forth below, the Court affirms the Commissioner's decision that Plaintiff was not disabled as of her date last insured on June 30, 2008.

## I.    PROCEDURAL HISTORY

On August 12, 2013, Plaintiff filed an application for DIB alleging a disability onset date of February 18, 2003.  (R. 146-47.)[2]  On October 30, 2013, the Commissioner determined that Plaintiff was not disabled and denied the application.  (R. 79-85.)  Plaintiff filed for reconsideration, and her application was again denied on March 5, 2014. (R. 86-94.)  On February 5, 2016, an Administrative Law Judge held a hearing on Plaintiff's application; Plaintiff was represented by counsel at the hearing.  (R. 29-78.)  On March 14, 2016, the ALJ issued a decision denying Plaintiff's application.  (R. 12-28.)  On February 10, 2017, the Appeals Council denied Plaintiff's request for review (R. 1-5), thereby affirming the ALJ's decision as the "final" decision of the Commissioner.

On April 12, 2017, Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3).  ECF No. 1.  On April 25, 2018, Plaintiff consented to have a

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.  On March 6, 2018, the Government Accountability Office stated that, as of November 17, 2017, Ms. Berryhill's status violated the Federal Vacancies Reform Act, which limits the time a position can be filled by an acting official and "[t]herefore Ms. Berryhill was not authorized to continue serving using the title of Acting Commissioner[.]"  *Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1988 Commissioner*, Social Security Administration, Government Accountability Office (Mar. 6, 2018). However, Ms. Berryhill continues to functionally lead the Social Security Administration from her position of record as Deputy Commissioner of Operations.  Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted as the defendant in this suit.

[2] "R." refers to the continuous pagination of the administrative record.  ECF No. 5.

U.S. Magistrate Judge conduct all further proceedings in the case to disposition pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  ECF No. 12.[3]  The case was reassigned to the undersigned Magistrate Judge on June 27, 2018.

## II.    LEGAL STANDARD

### A.    Standard of Review

This Court has the authority to conduct a plenary review of legal issues decided by the ALJ in reviewing applications for DIB.  *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence.  *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g) & 1383(c)(3).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309 (JLL), 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).  Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'"  *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *see K.K.*, 2018 WL 1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g., Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry

---

[3] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision.  *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Coleman*, 2016 WL 4212102 at *3 (citing *Schonewolf*, 972 F. Supp. at 284-85) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978))).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d

4

501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000));
*see K.K.*, 2018 WL 1509091, at *4.  The Court "need[s] from the ALJ not only an expression of
the evidence s/he considered which supports the result, but also some indication of the evidence
which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ
may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which
[s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186
F.3d 422, 429 (3d. Cir. 1999)).  "[T]he ALJ is not required to supply a comprehensive explanation
for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice."
*Cotter*, 650 F.2d at 482.  Absent such articulation, the Court "cannot tell if significant probative
evidence was not credited or simply ignored." *Id.* at 705.  As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the
> weight [s/]he has given to obviously probative exhibits, to say that [the] decision is
> supported by substantial evidence approaches an abdication of the court's duty to
> scrutinize the record as a whole to determine whether the conclusions reached are
> rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can
enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or
without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  Remand is appropriate if the
record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or
contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210,
221-22 (3d Cir. 1984)).  Remand is also appropriate if the ALJ's findings are not the product of a
complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the
record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see
A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).  A decision to "award

benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518.  In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays.  *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000).  An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits."  *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

## B.    <u>Standard for Awarding Benefits</u>

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for DIB based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  20 C.F.R. § 404.1505(a).  An impairment is "medically determinable" if it results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques.  Thus, an impairment can be established by objective medical evidence from an acceptable medical source, but cannot be established by a statement of symptoms, a diagnosis, or a medical opinion.  *Id*. § 404.1521.

The process for determining an adult's claim for DIB involves a five-step sequential inquiry.  20 C.F.R. § 404.1520(a)(4).[4]  The claimant bears the burden of proof at Steps One through

---

[4] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 C.F.R. § 404.1527.

Four.  At Step Five, the burden shifts to the Commissioner.  *Id.* § 404.1512; *see Holley v. Colvin*, 975 F. Supp.2d 467, 476-77 (D.N.J. 2013), *aff'd sub nom. Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014).  At each Step, the ALJ must consider the combined effect of all of the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step.  20 C.F.R. § 404.1523(c).

At Step One, the ALJ decides whether the claimant is currently engaging in substantial gainful activity.  20 C.F.R. § 404.1520(b).  Substantial gainful activity is work activity that involves doing significant physical or mental activities and is usually done for pay or profit.  *Id.* §§ 404.1572(a) & (b).  If the claimant is engaging in such activity, then the inquiry ends because the claimant is not disabled.

"The [Step Two] inquiry is a de minimis screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003).  At this step, the ALJ decides whether the claimant has an impairment or a combination of such impairments that is severe.  20 C.F.R. § 404.1520(c).  An impairment or combination of impairments is severe if it significantly limits a claimant's ability to perform basic work activities.  An impairment or combination of impairments is not severe if the claimant has a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations.  *Id.* § 404.1522.  If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment(s) in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1.   20 C.F.R.

§§ 404.1520(d), 404.1525, 404.1526. If the claimant's specific impairment is not listed, the ALJ will consider the most closely analogous listed impairment for purposes of deciding medical equivalence. *Id*. § 404.1526(b)(2). If the claimant has an impairment or combination of impairments that meets or medically equals a Listing, then the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. § 404.1509.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC"), determine the physical and mental demands of the claimant's past relevant work, and determine whether claimant has the level of capability needed to perform past relevant work. 20 C.F.R. §§ 404.1520(e) & (f). RFC is the claimant's maximum remaining ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. Past relevant work is work performed (either as the claimant actually performed it or as it is generally performed in the national economy) either within the last 15 years or within 15 years prior to the disability date. In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity. *Id*. §§ 404.1560, 404.1565. If the claimant's RFC enables her/him to perform past relevant work, then the claimant is not disabled.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). If the claimant is incapable of doing so, then s/he is presumed to be disabled if her/his impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

In deciding the claimant's ability to perform other jobs that exist in significant numbers in the national economy, the ALJ must consider whether the claimant's impairment and symptoms

result in exertional and/or non-exertional limitations. The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. §§ 404.1569a(a) & (b). Non-exertional limitations affect a claimant's ability to meet all other demands of a job (i.e., non-strength demands), including but not limited to difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching. *Id*. § 404.1569a(c).

If the claimant has no non-exertional limitations and can perform all or substantially all exertion demands at a given level, then the ALJ must use the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 C.F.R. § 404, Subpart P, Appendix 2. 20 C.F.R. § 404.1569a(b). The Grid Rules reflect various combinations of RFC, age, education, and work experience and direct a finding of disabled or not disabled for each combination. If the claimant also has any non-exertional limitations or cannot perform substantially all the exertional demands at a given level, then the Grid Rules are used as a framework for decision-making unless there is a rule that directs a conclusion of disabled without considering the additional non-exertional or exertional limitations. *Id*. § 404.1569a(d). If the claimant has solely non-exertional limitations, then the Grid Rules provide a framework for decision-making. *Id*. § 404.1569a(c).

## III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was several weeks short of her thirty-first birthday on the alleged onset date (February 8, 2003), and the date last insured was June 30, 2008. (R. 273.) At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period between her alleged onset date through her date last insured. (R. 17.) At Step Two, the ALJ found that Plaintiff

had the following severe impairment:  degenerative disc disease.  (R. 17.)  At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that were severe enough to meet or medically equal the severity of any Listing.  (R. 17.)  At Step Four, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work, subject to various exertional and non-exertional limitations.  (R. 18.)  The ALJ also found at Step Four that Plaintiff was not capable of performing her past relevant work as a convenience store manager and data entry clerk.  (R. 22.)  At Step Five, the ALJ found that a finding of not disabled would be directed by the Grid Rules if Plaintiff had the RFC to perform the full range of sedentary work. The ALJ also found at Step Five that certain jobs – envelope addresser, document preparer, and order clerk – existed in significant numbers in the national econmy for an individual with Plaintiff's age, education, work experience, and RFC.  (R. 22-23.)  The ALJ therefore concluded that Plaintiff was not disabled at any time between her alleged onset date and date last insured.  (R. 23.)

Plaintiff asks the Court to remand the case for a new hearing both because the RFC finding was not supported by substantial evidence and because the ALJ erroneously evaluated Plaintiff's subjective pain symptoms.[5]  Defendant contends that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence.

---

[5] In the "opening statement" and "summary of argument" sections of Plaintiff's brief, she requests that the Court reverse the ALJ's denial of benefits and remand for payment (ECF No. 9 at 1, 9), but this is merely boilerplate.  Plaintiff repeatedly requests throughout the remainder of her brief that the Court remand for a new hearing.  *See id.* at 13, 22, 26.

## IV.    SUMMARY OF RELEVANT EVIDENCE

### A.    Medical Evidence.[6]

On February 18, 2003, Plaintiff slipped on ice while at work.  She was prescribed Flexeril and Darvocet in the emergency room for a resulting back injury.  On February 20, 2003, Plaintiff was treated at Concentra Medical Centers for mid lower back pain that did not radiate but was worse with sitting, bending, or lifting.  Physical examination revealed tenderness over mid lower back; palpable spasms; decreased range of motion; negative bilateral straight leg raising; intact sensations; and normal gait.  Plaintiff was diagnosed with lumbar strain, put on modified work duty, and prescribed physical therapy 3 times per week for 2 weeks.  (R. 256-57.)  On February 25, 2003, Plaintiff returned to Concentra Medical Centers for mid lower back pain that radiated to the lateral right thigh and caused numbness in both legs and feet after sitting for prolonged periods. She complained that her pain was also exacerbated by walking flexion or extension.  Physical examination findings were like the prior visit, except that Plaintiff demonstrated positive right side straight leg raising.  She was diagnosed with lumbar strain and radiculopathy and was prescribed continued physical therapy.  (R. 249-50.)

On March 4, 2003, Plaintiff returned to Concentra Medical Centers with right lower back pain that caused numbness in her right leg after prolonged sitting.  Physical examination findings were like the prior visit, except that Plaintiff demonstrated negative bilateral straight leg raising. An MRI of Plaintiff's lumbar spine revealed a small herniated nucleus pulposus at L4-L5.  Plaintiff was diagnosed with lumbar strain and radiculopathy and referred to a physiatrist.  (R. 239-40.)

---

[6] The Court summarizes relevant medical evidence prior to Plaintiff's date last insured on June 30, 2008. Post-June 30, 2008 medical evidence included treatment notes from Dr. Freeman from March 2010 through November 2015; procedure reports from Dr. Freeman dated August 29 and December 28, 2012; a General Medical Report completed by Dr. Freeman on November 11, 2013; and pharmacy records from March 19 through December 15, 2015.

On March 11, 2003, Plaintiff was evaluated by Dr. Jonathan Lester (physiatrist) from US MedGroup.  Physical examination revealed:  negative lumbar spine inspection; full lumbar range of motion; 5/5 motion in lower extremities; sensory exam to light touch diminished in right leg in regional distribution; deep tendon reflexes one plus and symmetric at knees and ankles; negative bilateral straight leg raise; some tenderness at palpation of back at L4; no spasms; full range of motion in hips and knees; and benign extremities.  Dr. Lester diagnosed lumbar strain with underlying degenerative L4-L5 disc, with "[n]o evidence of significant [herniated nucleus pulposus] or neurologic compromise to correlate with the patient's subjective right lower extremity sensory disturbance."  He recommended an EMG study of Plaintiff's right lower extremity to assess objective findings of acute radiculopathy, and he cleared Plaintiff for return to modified work duty with a lifting restriction of 40 pounds.  (R. 237-38.)

On March 18, 2003, Plaintiff returned to Dr. Lester.  She reported waxing and waning moderate to severe back pain with occasional radiation into the right proximal thigh, with more discomfort in the left leg and less discomfort in the right leg.  Dr. Lester noted that EMG studies of the right lower extremity were normal, and previous MRI studies showed degenerative changes with a small central disc herniation at L4-L5.  Physical examination findings were like the prior visit.  Dr. Lester diagnosed mild right lumbar radiculopathy without EMG changes and discussed a trial of lumbar epidural steroid injections.  Plaintiff was reluctant to proceed with injections and was referred for 2 additional weeks of physical therapy with a prescription for Ultracet.  (R. 236.)

On April 1, 2003, Plaintiff returned to Dr. Lester.  She reported that additional physical therapy provided no significant benefit and continued to complain of back pain with numbness throughout the entire right lower extremity.  She also reported back pain that radiated into the left leg and numbness in the left foot.  Dr. Lester observed MRI evidence of degenerative disc disease,

a small central disc herniation at L4-L5, and bilateral S1 Tarlov cyst. Physical examination findings were like the prior visit. He opined:

> Persistent subjective back and lower extremity pain complaints and sensory complaints which appear to be out of proportion to objective findings. Her EMG study of the right lower extremity was negative for any evidence of acute radiculopathy. The physical exam does not appear to indicate a discrete radiculopathy. At this point, I am somewhat unclear as to the etiology of this patient's complaints. I really feel we are at or near the end of her evaluation and treatment. However, I think it would be beneficial to have the patient seen by an orthopedic surgeon for a second opinion to see if there are any additional appropriate recommendations for treatment or diagnostics. In the interim, however, I am going to release her to resume regular duty work. She does appear to benefit from the Ultracet so I will give her one more refill of that medication. I will see her back in two weeks.

(R. 225.)

On April 2, 2003, Plaintiff returned to Concentra Medical Centers. She reported that she had pain in the right lower leg and at times no sensation in her foot; that she attempted to work the previous day but did not last an hour; and that pain increased after sitting for ten minutes and as the day progressed. Physical examination revealed normal gait; negative bilateral leg raising; no costovertebral angle tenderness; no point tenderness; no sensory deficit; and decreased two point discrimination. Plaintiff was diagnosed with back strain and cleared for return to modified work duty. (R. 224.)

On April 17, 2003, Plaintiff was evaluated by Dr. Robert L. Hole (orthopedic surgeon) from US MedGroup on referral from Dr. Lester. Plaintiff reported no left-sided lower extremity symptoms and back pain extending mainly down her right leg into the sole and toes of her right foot. Physical examination revealed: normal gait; ability to bend forward fingertip to mid leg; no significant lumbar spasm; very mild and minimal tenderness on right side at L4-L5; no significant sacroiliac joint tenderness in either lower extremity; some tenderness in the lower border of the sacrum near her coccyx; negative bilateral Trendelenburg's sign; ability to heal and toe walk; no

obvious atrophy in either lower extremity; diminished sensation to light touch along sole of foot and calf; deep tendon reflexes absent at both knees, 1+ at both ankles and symmetric; negative straight leg raise in sitting and supine positions to 60-75 degrees; negative Fabre's test; and symmetric passive bilateral range of motion of both hips and knees.  Dr. Hole diagnosed right leg pain with symptoms suggestive of radiculopathy.  He opined:

> Her symptoms do appear to be radicular in nature.  She may have rather than a discrete radiculopathy in a typical fashion that of a herniated disc, possibly some radiculitis involving her S1 nerve root.  It is unclear to me why her EMG and nerve conduction study was normal unless this was simply a false negative cast or her symptoms are insufficient to be picked up by this study.  Her MRI report was not overly impressive in terms of any significant involvement of her L5 or S1 nerve root other than the MRI report stating that there was some mild impingement perhaps of the S1 nerve roots bilaterally.  At this point I would tend to agree it is unclear as to what can be offered her in terms of assisting her pain relief other than perhaps a pain management evaluation.  The perineural cyst on the right did appear to be greater than the left which at least does localize her site of symptoms.

(R. 221-23 (recommending an evaluation with an orthopedic spine specialist or neurosurgeon).)

On April 24, 2003, Plaintiff returned to Concentra Medical Centers.  She reported a continuing pattern of symptoms with midline lower back pain that radiated to the right posterior and lateral thigh and leg.  She also reported that medications provided some relief but that her symptoms were exacerbated by prolonged activity or sitting.  Physical examination revealed: normal gait; negative bilateral leg raising; tender over mid lower back; no palpable spasms; decreased range of motion; and deep tendon reflexes intact with decreased sensation over right posterolateral thigh.  Plaintiff was diagnosed with lumbar strain and radiculopathy, cleared to continue modified work duty, and referred to an orthopedic spine surgeon as recommended by Dr. Hole.  (R. 219-20.)

On February 24, 2004, Dr. Marvin E. Friedlander (neurosurgeon) from The Back Institute examined Plaintiff on referral from Dr. Schulman.[7]  Dr. Friedlander observed: mild lumbar tenderness on palpation; excellent strength in all muscle groups; mild decreased sensation in what appeared to be the right L5-S1 dermatome; reflexes all 2/4; and no straight leg raising.  He opined that Plaintiff was suffering from lumbar radiculopathy as well as chronic low back pain, most likely because of internal derangement, annular tear, and disc herniation at L4-L5.  He recommended consideration of an interbody fusion at L4-L5, to be preceded by a discogram.  Dr. Friedlander noted that Dr. Lombardi Edison, who previously treated Plaintiff, also recommended the same procedure.[8]  (R. 413.)

On January 25, 2005, Plaintiff was admitted to Trinitas Hospital for a herniated lumbar disc at L4-L5 with internal disc derangement.  Dr. Friedlander performed a lumbar interbody surgery with lateral fusion and pedicle screw fixation at L4-L5.  Plaintiff was discharged three days later with prescriptions for analgesics and instructions to follow-up in two weeks.  (R. 259-80.)

On November 20, 2006, Plaintiff was evaluated by Dr. Eric D. Freeman (pain management) from Freeman Pain Institute on referral from Dr. Simon.[9]  Plaintiff reported that she did well with lumbar fusion surgery but continued to have pain in the lower lumbar spine.  Although she complained of a constant dull ache, Plaintiff denied any significant radicular pattern.  She also reported that pain was exacerbated with bending forward, coughing, sneezing, bending backward, and lying down.  Physical examination revealed:  tenderness to palpation in lumbar paraspinal

[7] There are no files in the record from Dr. Schulman.

[8] There are no files in the record from Dr. Edison.

[9] There are no files in the record from Dr. Simon.

15

muscles on the right primarily; limitation of lumbar extension on the right; and otherwise normal findings. Dr. Freeman noted that Plaintiff's lumbar spine x-rays from April 3, 2006 demonstrated intact posterior fusion at L4-L5 with no evidence of mobility in flexion and extension. He diagnosed lumbar fusion with possible myofascial instability and explained that Plaintiff's treatment options consisted of doing nothing, conservative management, and surgery. Dr. Freeman opined that Plaintiff's pain might be related to the fusion itself because she had no significant facet joint pain and no signs of radiculopathy. He recommended that she revisit physical therapy and progress to a home exercise program, using prescribed muscle relaxants only if necessary. (R. 380-86.)

On November 28, 2006, Michael Mitacchione (physical therapist) from ProCare Rehabilitation evaluated Plaintiff on referral from Dr. Freeman. Plaintiff stated that her leg symptoms had been relieved with surgery but her lower back pain persisted, with a recent exacerbation over the past few weeks. She rated her pain at 4 on a 10-point scale and advised that pain was worse with transition movements and in the morning. Mr. Mitacchione observed: normal gait; normal bilateral L1-S2 myotomes; poor sitting and standing postures; reduced lumbar lordosis; no lateral shift; and hypermobility on lower thoracic spine. He opined that Plaintiff presented with signs and symptoms of a mechanical derangement of the lumbar spine with repeated movement testing showing a directional preference toward lumbar flexion. Mr. Mitacchione recommended 4 weeks of physical therapy and diagnosed "failed lumbar fusion." (R. 414.)

On December 19, 2006, Plaintiff saw Mr. Mitacchione after completing 8 physical therapy sessions. Plaintiff advised that she felt 50-60% better but still experienced low back pain during the day rated 5-6 on a 20-point scale. Mr. Mitacchione reported that lumbar flexion was minimally

limited with decreased pain; lumbar extension was moderately limited with increased lower back pain; and straight leg raising was limited to 45 degrees bilaterally due to hamstring tightness. He opined that Plaintiff had progressed well in therapy and would benefit from continued therapy for an additional 3-4 weeks before transitioning to a home exercise program. (R. 415.)

On December 20, 2006, Plaintiff returned to Dr. Freeman and reported 50% improvement from the prior visit. She also reported that she still had lower back pain but no significant radicular pain. Physical examination revealed tenderness to palpation in lumbar paraspinal muscles bilaterally with limitation of lumbar extension and end range of flexion but otherwise normal findings. Dr. Freeman diagnosed post lumbar fusion. He again explained that Plaintiff's treatment options consisted of doing nothing, conservative management, and surgery. Plaintiff elected to continue with physical therapy. (R. 379, 384-85.)

On October 19, 2007, Plaintiff returned to Dr. Freeman and complained of an exacerbation of low back pain that was sharp and shooting in nature. However, by the appointment, her back pain had improved to 4 on a 10-point scale. Physical examination revealed tenderness to palpation in lumbar paraspinal muscles, no specific trigger points, and otherwise normal findings. Dr. Freeman diagnosed lumbar fusion syndrome myofascial exacerbation. He again explained that Plaintiff's treatment options consisted of doing nothing, conservative management, and surgery. Plaintiff opted for a Lidoderm patch prescription; she was instructed to return for trigger point injections if she experienced a flare-up. Plaintiff decided to hold off on more physical therapy because she had only 4 sessions remaining for the year. (R. 376-77.)

On February 15, 2008, Dr. Freeman treated Plaintiff with a right sacral trigger point injection. (R. 375.) During a follow-up with Dr. Freeman on March 7, 2008, Plaintiff reported that she experienced 60% improvement. Physical examination revealed tenderness to palpation

17

on the lumbar paraspinal muscles in the right sciatic notch and sacral sulcus but otherwise normal findings. Dr. Freeman diagnosed lumbar fusion syndrome and right sacroiliitis. He explained that Plaintiff's treatment options consisted of doing nothing, conservative management, and surgery. Plaintiff decided to hold off on any further treatment. (R. 372.)

On May 29, 2008, Plaintiff returned to Dr. Freeman and reported that over the weekend she had experienced severe muscle spasms in the lower back on both sides which radiated upward and between her scapula. She had treated the pain with Percocet and Amrix (both prescribed by her primary physician) and an over-the-counter valerian root.[10] The upper back pain seemed to have resolved itself; she still had some mild bilateral lower back pain. Physical examination revealed tenderness to palpation on the lumbar paraspinal muscles bilaterally but otherwise normal findings. Dr. Freeman diagnosed failed back, myofascial pain, and muscle spasm. He explained that Plaintiff's treatment options consisted of doing nothing, conservative management, and surgery. Plaintiff decided not to receive trigger point injections. (R. 369-70.)[11]

On October 30, 2013, State Agency reviewing consultant Dr. Deogracias Bustos opined that "additional evidence is needed to fully assess the severity of the claimant's condition up to and including the [date last insured] of 6/30/08." (R. 81.) On March 5, 2014, State Agency reviewing consultant Dr. Arvind Chopra concurred that there was "[i]nsufficient evidence prior to [date last insured] to rate impairment severity and propose limitations." (R. 92.)

**B.    Function Reports & Hearing Testimony.**

On February 8, 2014, Plaintiff submitted a Function Report that was summarized by the ALJ as follows:

---

[10] There are no files in the record from Plaintiff's primary care physician.

[11] After May 2008, there are no treatment notes from Dr. Freeman in the record until March 2010.

> She indicated that she cannot lift anything over ten pounds, sitting for more than an hour and bending cause spasms, and standing for more than 15 minutes causes pain. She also indicated that she can walk for about 30 to 40 minutes before needing to rest, and that she would need 15 to 20 minutes to rest, though sometimes she would need over 24 hours. The claimant's activities of daily living included cooking and cleaning for her husband and two children, though she was limited by difficulty bending. Her housework included laundry, dishes, and general cleaning. She also took her kids to school and picked them up, and she would sometimes go to Boy Scout meetings with them. The claimant usually shopped for an hour each week. She indicated that her memory and concentration were bad and that she was not able to finish what she started, but she also stated she was able to pay attention for 30 to 45 minutes and she could follow spoken instructions that only had two or three steps.

(R. 19.) Plaintiff also reported that she was awake most nights until two or three in the morning because of pain; took care of two dogs and three cats; did not experience any problems with personal care activities; and did not vacuum because of the back and forth motion. She further reported that she was prescribed a back brace about four years ago that she used when standing or walking a lot and when in pain. (R. 181-88.)

On February 9, 2014, Plaintiff's husband completed a Third-Party Function Report that the ALJ summarized as follows:

> He also indicated that the claimant took care of their children, did the cooking and light housework, and shopped for food, though he indicated she did this twice a week for a couple of hours. He also reported similar difficulties with lifting, walking, climbing stairs, and postural activities, though he also stated that she only needed five minutes of rest after walking for 15 to 20 minutes before she could resume walking. The claimant's husband indicated that she did not have any problems paying attention, finishing what she starts, or following written or spoken instructions.

(R. 19.) Plaintiff's husband also did not report any difficulties with her personal care activities. He further reported that Plaintiff was prescribed a back brace about 3 years ago and used it for long walks, house work, and during episodes of strong pain. (R. 189-96.)

Plaintiff testified during the ALJ hearing that her impairment began when she slipped and fell at work in February 2003. She was initially treated with physical therapy and anti-

inflammatory medications. When her pain levels did not decrease, she was treated with epidural injections and then, in January 2005, she underwent a lumbar fusion surgery. After a 6-7 month respite, her pain levels returned to the same degree as before the surgery. In 2006, Plaintiff's surgeon advised her to resume physical therapy and seek treatment from a pain management doctor. She was again treated with epidural injections and underwent a radio frequency ablation. Plaintiff was prescribed narcotics because the treatments had no effect. She took the medication twice daily and found that it made her pain bearable.

Plaintiff also testified that she did not drive when taking her pain medications because they caused drowsiness and nausea. The medications also made her foggy, causing problems with her memory and concentration. She was limited to lifting a gallon of water if she did so very slowly using both hands, although she could not do this repeatedly. She could sit only for 10 minutes before needing to change positions; could walk only for half a block; could stand only for 15 minutes; could not climb stairs; and could not bend down to lift things off the floor. Plaintiff no longer cleaned, did laundry, baked, or took her children to school.

Plaintiff further testified that her doctors advised that within 10-15 years of lumbar fusion surgery "it's very common for the disc above and below the fusion to go bad from the increased pressure". She lost feeling in her right leg for the last year, and a nerve test revealed "decreased nerve stuff going on." She was scheduled for a discogram to determine if she needed another surgery. (R. 18, 36-59.)

V.     DISCUSSION

A.     Step Four – RFC.

The ALJ found that as of June 30, 2008 (her date last insured) Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 CFR § 404.1567(a) subject to the

following limitations:

> [S]he could occasionally climb ramps and stairs but never ladders, ropes or scaffolds; she could never be exposed to unprotected heights or moving mechanical parts; she could occasionally bend, stoop, kneel, crouch and crawl; she could never have any exposure to extreme cold and only occasional exposure to humidity and wetness; the claimant was also limited to jobs involving simple and routine tasks.

(R. 18.)  Plaintiff contends that the RFC finding was not supported by substantial evidence because:  (1) the ALJ erroneously refused to call on the services of a medical expert pursuant to Social Security Ruling 83-20; (2) the ALJ erroneously rejected Dr. Freeman's opinion; and (3) the RFC did not reflect all of Plaintiff's credibly established limitations.

### 1.    Medical Expert.

A claimant must present adequate medical evidence of a disabling impairment prior to her/his date last insured to claim eligibility for DIB.  (R. 15, 17.)  *See* 42 U.S.C. §§ 416(i), 423(a)(1) & (c)(1); 20 C.F.R. §§ 404.101, 404.131.  By definitional necessity, a claimant's eligibility for DIB is dependent on an actual onset date that pre-dates or is the same as the date last insured.  *See* Social Security Ruling 83-20, *Titles II & XVI:  Onset Of Disability*, 1983 WL 31249, at *1 (S.S.A. 1983) ("The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations.").  SSR 83-20 permits an ALJ to call on the services of a medical expert to infer a claimant's actual onset date.[12]  The Third Circuit instructs that SSR 83-20 applies in situations where the underlying disease is progressive and difficult to diagnose, where the onset

---

[12] "SSR 83-20 does not impose a mandatory requirement on the ALJ to call on the services of a medical expert when onset must be inferred.  Instead, the decision to call on the services of a medical expert when onset must be inferred is always at the ALJ's discretion."  *Clarification of Social Security Ruling 83-20 – Titles II and XVI: Onset of Disability*, Emergency Message 16036 (SSA Oct. 17, 2016); *see Mays v. Barnhart*, 78 F. App'x 808, 813 (3d Cir. 2003) (ALJ "is not required to seek a separate medical opinion" for RFC determination); *Hanson v. Comm'r of Soc. Sec.*, No. 17-cv-316 (JLL), 2017 WL 6342153, at *3 (D.N.J. Dec. 12, 2017) ("Commissioner contends, pursuant to SSR-83-20, an administrative law judge is not required to seek medical testimony concerning a disability onset date in cases where the administrative law judge does not make a finding of disability.").

date is far in the past, and where medical records are sparse or conflicting. *See Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 618 (3d Cir. 2009) (citing *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 549 & n.7 (3d Cir. 2003) and *Walton v. Halter*, 243 F.3d 703, 709 (3d Cir. 2001)).

Having found that Plaintiff's date last insured was June 30, 2008, the ALJ was required to determine whether Plaintiff was disabled – that is, whether Plaintiff's actual onset date occurred – on or before June 30, 2008. The ALJ did not need the assistance of a medical expert to make that determination. Plaintiff's back impairment was not difficult to diagnose, nor was her alleged onset date far in the past. Most importantly, the ALJ was able to assess contemporaneous medical evidence from the relevant period.[13] *See Perez v. Comm'r of Soc. Sec.*, 521 F. App'x 51, 56-57 (3d Cir. Mar. 27, 2013) (SSR 83-20 did not apply where contemporaneous medical evidence demonstrated that diagnosed impairment was not disabling prior to date last insured); *Jakubowski v. Comm'r of Soc. Sec.*, 215 F. App'x 104, 107 (3d Cir. 2007) ("By contrast with *Newell* and *Walton* ... the ALJ in this case had access to adequate medical records from the time period before the expiration of [claimant's] insured status, and these records did not support her alleged onset date.")

As discussed below, the ALJ's RFC finding as of June 30, 2008 was supported by substantial evidence. Plaintiff is understandably disappointed by this outcome, especially because her back injury appears to have worsened in subsequent years – perhaps even to the point of disabling severity. That subsequent evidence may support an onset date after her date last insured is not, however, a basis for invoking SSR 83-20. The Court finds no error in the ALJ's decision not to seek medical expert testimony.

---

[13] The State Agency reviewing consultants who opined that the record was not sufficiently developed to assess Plaintiff's condition as of June 30, 2008 did not have access to Dr. Freeman's treatment notes for 2006 through 2008 or to Mr. Mitacchione's physical therapy records for 2006 through 2007. (R. 74-75.)

### 2.     Dr. Freeman's Opinion.

"[A]n ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317, 319 (3d Cir. 2000) (treating physician rule is "cardinal principle" guiding disability determinations); 20 C.F.R. § 404.1527(c)(2).  Even when a treating physician's medical opinion is not required to be given controlling weight, the opinion still may be entitled to some deference based on the ALJ's consideration of the following factors, which the ALJ must also consider as to non-treating and non-examining physician opinions:  length of treatment relationship, frequency of examination, nature and extent of the treatment relationship, relevant evidence used to support the opinion, consistency of the opinion with the entire record, and the expertise and specialized knowledge of the source.  20 C.F.R. § 404.1527(c)(2)-(6); *see Plummer*, 186 F.3d at 429 (ALJ "may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided").

Dr. Freeman completed a General Medical Report dated November 11, 2013 – over five years after Plaintiff's date last insured.  The ALJ accurately summarized this opinion as follows:

> Based on a history of low back pain radiating down to the claimant's lower extremities with constant dull aching associated with numbness and tingling, Dr. Freeman opined that the claimant could lift and carry up to ten pounds, sit for less than six hours per day, and stand and/or walk for less than two hours per day. Specifically, she was unable to sit or stand for any period of time.  Dr. Freeman indicated she had other limitations, but he did not specify what those were.  While the severity of the claimant's impairments appear[s] to have worsened over time and after her date last insured of June 30, 2008 (*see e.g*., Exhibit 6F, page 4) [R. 290 (Dr. Freeman's treatment notes from October 26, 2015)], Dr. Freeman's treatment notes during the period at issue indicated she had no radicular pain.  Her physical examinations consistently showed tenderness to palpation bilaterally with limitation of lumbar extension and end range of flexion, but otherwise her exams were unremarkable.  Also, following her surgery, Dr. Freeman followed a

conservative treatment plan consisting of physical therapy or medication, and the medical records indicate this was effective at the time.

(R. 21; *see* R. 284-286.)  Plaintiff argues that the ALJ erred by ascribing "little weight" instead of controlling or significant weight to Dr. Freeman's opinion.  The Court disagrees.

Following her fall in February 2003, Plaintiff was cleared to return to modified work the next month as a data entry clerk for an armored car company.  However, Plaintiff did not return to work because her employer could not limit her lifting and carrying duties to 40 pounds or less. (The VE testified that Plaintiff's position was classified as sedentary but performed as light or medium because she was required to lift and carry heavy bags of money.)  (R. 37, 61-62.)  There is no medical evidence in the record of any work-related restrictions following Plaintiff's spine surgery in January 2005.  Nor is there any medical evidence in the record between that surgery and Plaintiff's initial evaluation by Dr. Freeman in November 2006.  Plaintiff explained that her surgery had gone well but she continued to have a constant dull ache in her lower back.  Physical examination revealed:  tenderness to palpation in lumbar paraspinal muscles on the right; limitation of lumbar extension on the right; no significant facet joint pain; and no signs of radiculopathy.  Dr. Freeman recommended that Plaintiff revisit physical therapy and progress to a home exercise program, using prescribed muscle relaxants only if necessary.  When Plaintiff returned to Dr. Freeman in December 2006, she had completed 8 physical therapy sessions and reported 50% improvement; she opted to continue physical therapy.  Plaintiff did not see Dr. Freeman again until October 2007, when she was prescribed a Lidoderm patch for treatment for low back pain rated 4 on a 10-point scale.  In February 2008, Dr. Freeman treated Plaintiff with a trigger point injection. When Plaintiff returned to Dr. Freeman in March 2008, she reported 60% improvement and opted not to pursue any further treatment.  Plaintiff next saw Dr. Freeman in May 2008 and explained that she had recently experienced severe lower back muscle spasms that radiated upward.

24

Although the upper back pain resolved itself with Percocet and Amrix (both prescribed by her primary physician) and an over-the-counter valerian root, Plaintiff complained of mild bilateral lower back pain. Nevertheless, Plaintiff opted not to receive another trigger point injection and did not return to Dr. Freeman again until March 2010 – almost 2 years after her date last insured.[14]

As the ALJ found, "the record during the period at issue does not support the limitations Dr. Freeman found," and "the treatment records during the timeframe at issue (2003 to 2008) provide more probative value regarding claimant's level of functioning during the period at issue." (R. 21.) The Court therefore finds that substantial evidence supported the ALJ's assessment of Dr. Freeman's opinion.

### 3. Other Limitations.

The Court construes Plaintiff's remaining complaints about the ALJ's RFC finding as arguments that the RFC failed to reflect all of Plaintiff's credibly established limitations. The Court rejects each of them.

First, Plaintiff complains that "the ALJ refused to consider any evidence dated after the [date last insured] of June 30, 2008 even though [P]laintiff suffers from the same lumbar condition throughout the medical record." ECF No. 9 at 18 (citing R. 21). The ALJ correctly found that the relevant period for determining whether Plaintiff was disabled was February 13, 2003 (Plaintiff's alleged onset date) through June 30, 2008 (Plaintiff's date last insured). (R. 21.) The Court finds no reversible error in the ALJ's decision not to consider evidence after that period. *See Manzo v. Sullivan,* 784 F. Supp. 1152, 1156 (D.N.J. 1991) (claimant cannot prove entitlement by presenting

---

[14] Plaintiff asserts that she has been a patient of Dr. Freeman "receiving treatment once per month, from November 2006 through the date of the February 5, 2016 hearing." ECF No. 9 at 11. However, there is no record evidence that Dr. Freeman treated Plaintiff between May 2008 and March 2010. The record does contain Dr. Freeman's treatment records for various dates (but not monthly) during the period between April 2011 through November 2015.

post-DLI evidence relating to previously existing impairment that only reached disabling severity after DLI).

Second, Plaintiff complains that the ALJ "utilized her own lay instincts to guess about what [P]laintiff's RFC might have been between February, 2003 and June, 2008." ECF No. 9 at 22; *see id*. at 13 (asserting that Dr. Freeman's 2013 opinion is not contradicted by any evidence "other than the ALJ's lay impressions"). This complaint is unfounded. As discussed above, the ALJ relied on contemporaneous medical evidence from the relevant period. And as discussed below, the ALJ adequately considered Plaintiff's subjective symptoms.

Third, Plaintiff complains that "the decisional RFC finds [P]laintiff capable of all unskilled sedentary jobs that do not involve moving machinery." ECF No. 9 at 17 & n.5 (alleging that limitation to simple and routine tasks "is code for all 'unskilled work'" and other limitations "amount to filler or window dressing"). Plaintiff offers no specific additional limitations allegedly supported by evidence from the relevant period. Instead, she faults the ALJ for not including in the RFC finding certain limitations contained in various hypothetical questions to the ALJ: namely, that Plaintiff's "chronic pain and narcotic medications would render her unproductive ('off-task') somewhere between 5% and 15% (Tr. 64) and absent from work a number of days a month (Tr. 64) and also in need of a 'sit/stand option at will' to relieve symptoms (Tr. 63)." *Id*. The ALJ was not required to include these limitations in Plaintiff's RFC if the ALJ ultimately concluded – as is the case here – that they were not supported by substantial evidence for the period prior to Plaintiff's date last insured.

## B.  Subjective Symptoms.

"Credibility determinations as to a claimant's testimony, regarding pain and other subjective complaints are for the ALJ to make." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x

26

761, 765 (3d Cir. 2009) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)).  The ALJ is required to assess the credibility of a claimant's subjective complaints using a two-step process.  *See* 20 C.F.R. § 404.1529.   First, the ALJ must determine whether the record demonstrates that the claimant possesses a medically determinable impairment that could reasonably produce the alleged symptoms.  Second, the ALJ must assess the credibility of the claimant's complaints regarding the intensity of the symptoms.  To do this, the ALJ must determine if objective medical evidence alone supports the claimant's complaints; if not, the ALJ must consider other factors, including: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the pain; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms, (6) any other measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  The ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  Social Security Ruling 96-7p, *Policy Interpretation  Ruling Titles II & XVI:  Evaluation of Symptoms in Disability Claims:  Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at *4 (S.S.A. Jul. 2, 1996).[15]

---

[15] Social Security Ruling 96-7p applies to SSA decisions that, like the ALJ decision in this case, were made prior to March 28, 2016.

After noting that she considered Plaintiff's symptoms in accordance with the requirements of SSR 96-7p, the ALJ recited the two-step standard and concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  (R. 18, 21.)  Plaintiff argues that "as it turns out, the fact that [P]laintiff readily admitted that she performed light house work and took care of her children are the sole 'reasons explained in this decision.'"  ECF No. 9 at 26; *see id.* ("Plaintiff is essentially accused of non-credible, exaggerated testimony on the basis of her totally credible testimony and statements regarding her abiilty to perform housework at her leisure and her 'failure' to neglect her children.").  This is misleading and careless criticism of the ALJ's decision.  After analyzing the medical and non-medical evidence, the ALJ expressly considered the factors identified in 20 C.F.R. § 404.1529:

> In terms of the claimant's alleged exertional limitations, the medical evidence during the period at issue consistently shows tenderness along the lumbar spine and some decrease in her lumbar range of motion, but her gait was normal and she did not generally begin reporting radicular pain until after the period at issue. Furthermore, much of her treatment was conservative in nature, limited to medication, which she indicated was helpful, and physical therapy.  After her fusion of L4-L5, the record does not contain any treatment notes for almost two years. Also, the claimant's reported activities of daily living are inconsistent with the severity of the symptoms she alleged, though they are consistent with the findings based on the physical examinations and reports of unremarkable diagnostic imaging such as the negative EMG and nerve conduction study.

(R. 21.)  As to non-exertional limitations, the ALJ limited Plaintiff to jobs involving simple and routine tasks by giving "the benefit of the doubt" to Plaintiff's "alleged side effects from her medications and her allegations of difficulty with her concentration and memory, which, while not fully supported by her husband's third party report or notes in her treatment history, are reasonable given the medications prescribed."  (R. 22.)  The Court therefore finds that substantial evidence supported the ALJ's assessment of Plaintiff's subjective pain symptoms.

## V.    CONCLUSION

For these reasons, the Court affirms the Commissioner's decision that Plaintiff was not disabled prior to June 30, 2008 as set forth in the accompanying Order.


Dated:    March 4, 2019                    _____s/ Paul A. Zoss_____
At Newark, New Jersey                    PAUL A. ZOSS, U.S.M.J.